UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TYRONE DOTSON,

                                    Plaintiff,                           REPORT
                                                                          and
                        v.                                         RECOMMENDATION

BRIAN FISCHER, Commissioner New York State              12-CV-00930V(F)
  Department of Corrections and Community
  Supervision,
DR. CARL J. KOENIGSMANN, M.D., Deputy
  Commissioner and Chief Medical Officer, New York
  State Department of Corrections and Community
  Supervision,
DR. EILEEN DINISIO, Regional Medical Director,
  New York State Department of Corrections and
  Community Supervision,
DR. BEVERLY PRINCE, Erie County Medical Center,
DALE ARTUS, Superintendent, Wende Correctional
  Facility, New York State Department of Corrections
  and Community Supervision,
ROSALYN KILLINGER, Deputy Superintendent for
  Health Services, Wende Correctional Facility,
  New York State Department of Corrections and
  Community Supervision,
THOMAS STICHT, and
DR. JACQUELINE LEVITTE, M.D., Facility Health
  Services Director, Wende Correctional Facility,
  New York State Department of Corrections and
  Community Supervision,

                                    Defendants.
_____

APPEARANCES:          BUCKLEY SANDLER LLP
                      Attorneys for Plaintiff
                      ROSS ERIC MORRISON,
                      BRIAN JEFFREY WEGRZYN, and
                      MEGAN ELIZABETH WHITEHILL, of Counsel
                      1133 Avenue of the Americas
                      Suite 3100
                      New York, New York  10036

LETITIA JAMES
NEW YORK STATE ATTORNEY GENERAL
Attorney for Defendants
MICHAEL T. FEELEY
Assistant New York Attorney General, of Counsel
Main Place Tower
Suite 300A
Buffalo, New York  14202

## JURISDICTION

This case was referred to the undersigned by Honorable Lawrence J. Vilardo on

August 20, 2019, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendants' motion for summary judgment (Dkt. 44), filed July 11, 2018.

## BACKGROUND

Plaintiff Tyrone Dotson ("Plaintiff" or "Dotson"), then proceeding *pro se*,

commenced this action against Defendants, all employees of New York State

Department of Corrections and Community Supervision ("DOCCS"), alleging violations

of his civil rights.  In particular, Plaintiff maintains he was denied adequate medical

treatment for a cyst in his left ear and subjected to retaliation for filing prison grievances.

By Order filed May 6, 2013 (Dkt. 5), District Judge David G. Larimer dismissed the

Complaint with prejudice as against Defendants Fischer, Artus, Killinger, and Levitte for

lack of personal involvement, and also dismissed the Complaint as against Defendants

Koenigsmann and Dinisio, but without prejudice and with leave to replead as against

such Defendants.  Accordingly, on June 10, 2013, Plaintiff filed an Amended Complaint

(Dkt. 6) ("Amended Complaint"), which, by Order filed November 5, 2013 (Dkt. 7),

District Judge Richard J. Arcara dismissed for failing to state a claim. Plaintiff appealed

the dismissal to the Second Circuit Court of Appeals and on June 24, 2015, the Second

Circuit vacated the Order and remanded the matter for further proceedings (Dkt. 14).

On August 27, 2015, Ross Eric Morrison, Esq. and Brian Jeffrey Wegrzyn, Esq. filed

notices of appearances on Plaintiff's behalf, (Dkts. 16 and 17), and on December 8,

2015, were appointed by the undersigned as Plaintiff's *pro bono* counsel. (Dkt. 19). On

November 30, 2015, an Amended Complaint was filed (Dkt. 18) ("Second Amended

Complaint").

On July 11, 2018, Defendants filed the instant motion for summary judgment

(Dkt. 44) ("Defendants' Motion"), attaching the Statement of Undisputed Facts (Dkt. 44-

1) ("Defendants' Statement of Facts"), the Memorandum of Law in Support of

Defendants' Motion for Summary Judgment (Dkt. 44-2) ("Defendants' Memorandum"),

the Declaration of Assistant Attorney General Michael T. Feeley (Dkt. 44-3), and

exhibits B through E (Dkts. 44-4 through 44-7) ("Defendants' Exh(s). __").[1] On October

3, 2018, Megan Elizabeth Whitehill, Esq. filed a notice of appearance of Plaintiff's behalf

(Dkt. 47), and Plaintiff filed Plaintiff's Memorandum of Law in Opposition to Defendants'

Motion for Summary Judgment (Dkt. 48) ("Plaintiff's Response), attaching Plaintiff's

Response to Defendants' Statement of Undisputed Facts (Dkt. 48-1) ("Plaintiff's

Statement of Facts"), the Declaration of Brian J. Wegrzyn, Esq. (Dkt. 48-2) ("Wegrzyn

Declaration"), with exhibits 1 and 2 (Dkts. 48-3 and 48-4) ("Plaintiff's Exh(s). __"). In his

response, Plaintiff discontinued the action as against Defendants Dr. Koenigsmann and

---

[1] As explained by AAG Feeley, Defendants' Exh. A, consisting of certified copies of Plaintiff's medical records and the blotter, disciplinary history, and chronological history from DOCCS were previously disclosed to Plaintiff and the court as part of Defendants' mandatory disclosure, with each page Bates-stamped. Feeley Declaration ¶ 3 (referencing Dkt. 29, filed June 29, 2016).

Dinisio.[2]  Plaintiff's Response at 1 n. 1.  On November 30, 2018, Defendants filed the Reply Memorandum of Law in Further Support of Motion for Summary Judgment (Dkt. 49) ("Defendants' Reply").  Oral argument was deemed unnecessary.

Based on the following, Defendants' Motion should be DENIED in part and GRANTED in part; the Clerk of Court should be directed to close the file.[3]

## FACTS[4]

Plaintiff Tyrone Dotson ("Plaintiff" or "Dotson"), is an inmate in the custody of New York State Department of Corrections and Community Supervision ("DOCCS"), the employer of each named Defendant to this action.  Defendants include Carl Koenigsmann, M.D. ("Dr. Koenigsmann"), then DOCCS Regional Medical Director for a downstate region, Eileen Dinisio ("Dinisio"), a nurse employed as a Regional Health Services Administrator in the Office of the Chief Medical Officer in Albany, New York, Beverly Prince, M.D. ("Dr. Prince"), an otolaryngologist retained by DOCCS to provide consultant medical treatment upon referrals from DOCCS, and Thomas Sticht ("Sticht"), Deputy Superintendent for Security Services at Wende Correctional Facility ("Wende" or "the correctional facility"), in Alden, New York.  At all times relevant to this action, Plaintiff was incarcerated at Wende.

Since at least age 12, Plaintiff has had medical problems with his left ear. Plaintiff's Statement of Facts ¶ 56.  In 2005, during a previous period of incarceration,

---

[2] Although in naming Dinisio a Defendant, Plaintiff refers to her as a medical doctor, *see*, *e.g.*, Second Amended Complaint Caption and ¶¶ 17, 30, 32, Defendants maintain, Defendants' Statement of Facts ¶ 2, and Plaintiff does not dispute, that Dinisio is not a medical doctor but a nurse.
[3] The undersigned recommends denial of Defendants' Motion insofar as Defendants argue Dr. Prince was not a state actor for purposes of § 1983 liability, but recommends granting summary judgment on the merits of the § 1983 claims.
[4] Taken from the pleadings and motion papers filed in this action.

Plaintiff underwent a stapedectomy (middle ear surgical procedure to improve hearing),
and on April 24, 2006, Plaintiff had a "second stage tympanomastoid" (surgery to treat
damaged eardrum and ear tissue resulting from frequent ear infections).  Plaintiff's
Statement of Facts ¶ 56.  At that time, Plaintiff had a cholesteatoma (abnormal,
noncancerous skin growth behind the ear drum) in his left ear which was treated by the
surgical removal of the ossicles (bones of hearing) of Plaintiff's left ear and replacement
with a prosthesis.  Plaintiff's Statement of Facts ¶ 57.  Following the procedure, Plaintiff
"had slight hearing loss, but it was nonsignificant," Plaintiff's Dep. Tr.[5] at 13, for which
Plaintiff used a hearing aid.  *Id.* at 14.  In 2008, Plaintiff underwent the surgical removal
of the previously inserted prosthetic hearing bone that was "ill-fitting" and had become
infected.  Plaintiff's Statement of Facts ¶ 56; Plaintiff's Dep. Tr. at 15-16.  Plaintiff's
hearing continued to deteriorate to where an audiologist classified Plaintiff's hearing
loss downward in 2008 and 2009 prior to Plaintiff's transfer to Wende, *id.*, at which time
Plaintiff was no longer able to use a hearing aid.  *Id.* at 14.  Beginning June 24, 2009,
Plaintiff was given antibiotics for treatment of inflammation of the external ear canal.
Plaintiff's Statement of Facts ¶ 58.

On August 11, 2009, after being transferred to Wende, Plaintiff was examined by
Nurse Practitioner Hope Obertean ("NP Obertean"), who reported Plaintiff with a
recurrent cholesteatoma and worsening impaired hearing in his left ear.  Dkt. 18 at 14.
NP Obertean referred Plaintiff for a consultation with Beverly Prince, M.D. ("Dr. Prince"),
an otolaryngologist.  *Id.*  At the consultation on August 18, 2009, Dr. Beverly found
Plaintiff's left ear with clear drainage, and Plaintiff was nauseated, vomiting, and had

---

[5] References to "Plaintiff's Dep. Tr." are to the page of the transcript of Plaintiff's deposition filed as Dkt.
48-4.

vertigo.  Plaintiff's Statement of Facts ¶ 59.  Dr. Prince cleaned Plaintiff's ear, causing

Plaintiff to become diaphoretic (to sweat heavily), to develop nystagmus (uncontrolled

eye movements), and to become nauseated.  *Id.* ¶ 62.  Dr. Prince advised Plaintiff to

keep his ear dry and that plugs were needed to allow Plaintiff to wear a cross-hearing

aid.  *Id.* ¶ 63.  Dr. Prince ordered a CT scan of the mastoid and middle ear, indicating

the order was "Urgent," as Plaintiff had a "potential life-threatening disease."  *Id.* ¶¶ 64-

66.  According to Dr. Prince, because of its proximity to the brain, "any ear infection has

the potential to be life-threatening."  *Id.* ¶ 67.  Plaintiff underwent the CT scan of the

mastoid and middle ear, returning to Dr. Prince on August 25, 2009 for a follow-up

appointment.  *Id.* ¶¶ 72-73.  The CT scan revealed Plaintiff with pressure equalizing

("PE") tubes in both ears for ventilation, and conductive hearing loss in the left ear which

Dr. Prince attributed to the prior surgical removal of Plaintiff's ossicles.  *Id.* ¶ 76; Bates

1198 (Dkt. 48-3 at 18).  Dr. Prince planned a surgical exploration of Plaintiff's left

mastoid cavity, which is a diagnostic procedure to see if there was a "lateral canal

fistula" (abnormal opening in the ear canal), which would indicate advancement into the

inner ear of Plaintiff's recurrent cholesteatoma.  Plaintiff's Statement of Facts ¶¶ 77-79.

The recommended procedure was performed on September 28, 2009, with Dr. Prince

documenting Plaintiff had a radical mastoid cavity creating a keratin (fibrous structural

protein) exudate (leaking fluid) consistent with recurrent cholesteatoma, *id.* ¶ 83, and

Dr. Prince opened up the area to promote outward drainage so that the drainage would

not collect.  *Id.* ¶¶ 84-86.  At his post-operative appointment with Dr. Prince on October

6, 2009, Plaintiff's ear was still draining and Plaintiff continued to experience painful and

debilitating symptoms.  *Id.* ¶¶ 87-88.  Plaintiff thought the continuous drainage posed a

problem with hygiene and sanitation and despite Dr. Prince's reassurance that the continued drainage was not unexpected, Plaintiff was not happy that his ear was not dry. *Id.* ¶¶ 88-91. Dr. Prince put silver nitrate on the mucosal tissue in the left mastoid cavity to help close up and heal the epithelial layer, advising the silver nitrate should be applied every six weeks, and also provided Plaintiff with ear drops. *Id.* ¶¶ 92-93. Dr. Prince also checked whether the gauze packing left in the ear's surgical wound to keep open the edges of the new opening created from the surgery could be removed, *id.* ¶¶ 94-97.

Dr. Prince continued to follow Plaintiff for his recurrent cholesteatoma and on November 17, 2009, Plaintiff complained his ear was still draining, leading Dr. Prince to conclude Plaintiff likely had residual cholesteatoma, but that Plaintiff should not immediately undergo further surgery because it could worsen the condition. Plaintiff's Statement of Facts ¶¶ 99-102. Dr. Prince instead recommended fitting Plaintiff for a cross-hearing aid, and discontinued the silver nitrate applications because it was getting close to the facial canal. *Id.* ¶¶ 103-05. At a further consultation on May 4, 2010, Plaintiff's left ear continued to drain, and Plaintiff requested a cleaning of the mastoid to permit Plaintiff to wear his hearing aid. *Id.* ¶¶ 106-07. Dr. Prince changed Plaintiff's diagnoses from "crucial" to "cosmetic" because Plaintiff's condition was no longer considered life-threatening but, rather, the reason for any further surgery was to reduce the unpleasant odor emanating from Plaintiff's ear. *Id.* ¶ 110. Dr. Prince also requested a new CT scan to determine the condition of Plaintiff's left ear prior to performing another procedure. *Id.* ¶ 111.

On August 2, 2010, Dr. Prince performed another exploratory surgery of Plaintiff's left ear canal, during which Dr. Prince inspected the mastoid cavity, discovered the cholesteatoma had recurred which was removed with a drain placed, following which Plaintiff was given antibiotics.  Plaintiff's Statement of Facts ¶¶ 112, 118.  At a follow-up consultation on August 17, 2010, Dr. Prince informed Plaintiff of a skin graft procedure that could help dry up Plaintiff's ear and reduce drainage, thus allowing Plaintiff to wear his cross-hearing aid.  *Id.* ¶¶ 113-15.  On November 1, 2010, Plaintiff underwent this "revision of left canal-wall-up mastoidectomy with insertion of fascial graft for anterior tympanic membrane and insertion of split thickness skin graft in the posterior portion of the posterior inferior canal wall."  *Id.* ¶ 116.  Dr. Prince saw Plaintiff eleven times after the November 1, 2010 surgery, observing that Plaintiff's ear stopped draining about one year after such surgery, subsequent to which Dr. Prince was no longer involved with Plaintiff's medical care.  *Id.* ¶¶ 123-24.  Plaintiff maintains the November 1, 2010 surgical procedure should have been performed earlier.  *Id.*

On August 16, 2011, a medical doctor[6] completed a Medical Restriction Permit indicating that because bright lights and loud sounds, as were often found in Wende's messhall, triggered Plaintiff's vertigo symptoms, Plaintiff needed to "feed in cell" ("FIC Request") until February 16, 2012, when Plaintiff would be re-evaluated.  FIC Request Bates 144 (Dkt. 48-3 at 6).  The FIC Request was reviewed by Defendant Sticht, Deputy Superintendent for Security Services at Wende, who checked with the ordering physician that the FIC Request was appropriate for the inmate.  Sticht Dep. Tr.[7] at 24.  According to Sticht, the physician ordering the FIC determined when the restriction

---

[6] The requesting physician's signature is illegible.
[7] References to "Sticht Dep. Tr." are to the pages of the transcript of Sticht's deposition, filed as Dkt. 44-7.

would terminate.  *Id.* at 24-25.  Upon reviewing the FIC Request on August 31, 2011,

Sticht issued the FIC Permit which provided that several additional security restrictions

would also apply for the duration, including that Plaintiff would feed in cell, not attend

work or school, but only mandatory callouts, one hour daily outside exercise, and

showers.  FIC Request.  Plaintiff refers to these additional restrictions as imposing

"medical keeplock," which is a punitive status, whereas Sticht maintains there is no such

punitive designation as medical keeplock but, rather, medical keeplock is synonymous

with FIC.  Sticht Dep. at 25.  Sticht maintains the additional security restrictions

accompanied the FIC Permit because Plaintiff's susceptibility to vertigo raised safety

concerns with working or attending school within the correctional facility, and Plaintiff's

disciplinary history, including incidents of violence, was also considered.  *Id.* at 35-37.


## DISCUSSION


**1. Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).  The court is required to construe the evidence in the light most favorable to the

non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party

moving for summary judgment bears the burden of establishing the nonexistence of any

genuine issue of material fact and if there is any evidence in the record based upon any

source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Defendants argue in support of summary judgment that Plaintiff cannot sustain his Eight Amendment medical indifference claim against Defendants Dr. Koenigsmann

and NP Dinisio for lack of personal involvement, Defendants' Memorandum at 5-7,

Defendant Dr. Prince provided Plaintiff with objectively adequate medical care, *id*. at 7-

12, Plaintiff cannot establish the subjective element of his deliberate indifference claim

as against Defendants Dr. Prince, Dr. Koenigsmann, or NP Dinisio, *id*. at 12-15, that Dr.

Prince is not a DOCCS's employee but, rather, a specialist who provided consultant

medical care to inmate patients referred pursuant to a contract between Dr. Prince and

DOCCS, *id*. at 16, and Defendant Sticht was not aware of Plaintiff's previously filed

grievances such that Sticht cannot be held liable for retaliation.  *Id*. at 16-18.  In

opposing summary judgment, Plaintiff withdraws all claims asserted against Defendants

Dr. Koenigsmann and NP Dinisio, Plaintiff's Response at 1 n. 1, contends issues of fact

exist regarding whether Dr. Prince was deliberately indifferent to Plaintiff's serious

medical needs, precluding summary judgment on Plaintiff's Eighth Amendment claim as

alleged against Dr. Prince, *id*. at 7-13, and Plaintiff's filing of more than 15 grievances

over two years constituted protected activity of which Defendant Sticht must have been

aware, *id*. at 14-15, such that Sticht's placement of Plaintiff on medical keeplock as

alleged by Plaintiff, rather than simply approving the FIC Request without the additional

restrictions was intended to retaliate against Plaintiff for filing inmate grievances.  *Id*. at

15-19.  In further support of summary judgment, Defendants reiterate that Dr. Prince

was not a prison official and, thus, could not be liable under § 1983, the legal basis for

Plaintiff's Eighth Amendment claim, Defendants' Reply at 3-4, no evidence in the record

establishes any issue of fact that Dr. Prince's care was inadequate, *id*. at 4, and

Plaintiff's sole assertion in support of his retaliation claim against Defendant Sticht is

"strained" and fails to address Defendants' argument that Sticht would have taken the

same adverse action even if Plaintiff had not filed any grievances. *Id.* at 5-6. There is no merit to either of Plaintiff's claims.

**2.    42 U.S.C. § 1983**

Plaintiff's claims seek damages for alleged violations of constitutional rights pursuant to 42 U.S.C. § 1983 ("§ 1983"), which imposes civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States. Section 1983, however, is not itself a source of substantive rights but, instead, provides the mechanism by which a plaintiff may seek vindication of federal rights elsewhere conferred. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Here, the federal rights for which Plaintiff seeks vindication include the First and Eighth Amendments. Furthermore, as a prerequisite to relief under § 1983, a plaintiff must establish the defendant was personally involved in the alleged deprivation. *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) ("To establish a § 1983 claim, 'a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity.'" (quoting *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004))).

**A.    State Action**

Preliminarily, the court addresses Defendants' argument, Defendants' Memorandum at 16; Defendants' Reply at 3, that insofar as Defendants maintain Dr. Prince's status as a state contractor, rather than a DOCCS's employee, Plaintiff's § 1983 claim against Dr. Prince is barred. Although Plaintiff has not challenged this argument, the court addresses it as required by Fed.R.Civ.P. 56. *See Scott v. Howard*,

2018 WL 4765120 at * 3 (W.D.N.Y. Aug. 20, 2018) ("The failure to oppose summary

judgment, however, does not require granting summary judgment in favor of the

movant; rather, '[a]n unopposed motion for summary judgment may be granted 'only if

the facts as to which there is no genuine dispute show that the moving party is entitled

to judgment as a matter of law.'" (quoting *Payne v. Colburn*, 2017 WL 4330372 at * 3

(N.D.N.Y. Aug. 29, 2017) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996))),

*report and recommendation adopted*, 2018 WL 4749477 (W.D.N.Y. Oct. 2, 2018).

State action is an essential element of any section 1983 claim. *See DeMatteis v.

Eastman Kodak Co.*, 511 F.2d 306, 311 (2d Cir. 1975) ("A private party violates

[section][8] 1983 only to the extent its conduct involves state action.").  To that end, a

private party may become a state actor only under limited conditions including, as

relevant here, when the entity has been delegated a public function by the state.

*Sybalski v. Indep. Grp. Home Living Program Inc.*, 546 F.3d 255, 257 (2d Cir. 2008).  To

be considered a state actor under this so-called "public function test," the plaintiff must

show that the private party used powers "traditionally the exclusive prerogative of the

State."  *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982).  Generally, "[t]he provision of

medical care to incarcerated prisoners is a public function, even if private physicians

contract with the government to provide those services."  *Young v. Halle Hous. Assocs.,*

*L.P.*, 152 F. Supp. 2d 355, 365 (S.D.N.Y. 2001)); *see also West v. Atkins*, 487 U.S 42,

56 (1988) ("It is only those physicians authorized by the State to whom the inmate may

turn.").  Nevertheless, where a defendant physician treats prison inmates, it is "the

physician's function within the state system, not the precise terms of his employment,

---

[8] Unless otherwise indicated, bracketed material has been added.

that determines whether his actions can fairly be attributed to the State in a suit under 42 U.S.C. § 1983." *Doe v. Torres,* 2006 WL 290480, at *9 (S.D.N.Y. Feb. 8, 2006)); *see also West*, 487 U.S. at 55-56 ("[A] physician employed by [a state] to provide medical services to state prison inmates ... act[s] under color of state law for purposes of [section] 1983 when undertaking his duties in treating [a prisoner's] injury.").  Thus, "[t]he crucial inquiry in determining whether a physician who provides medical services to inmates is a state actor for purposes of [section] 1983, is the relationship among the State, the physician, and the plaintiff." *Nunez v. Horn*, 72 F. Supp. 2d 24, 27 (N.D.N.Y. 1999) (Hurd, J.) (citing *West*, 487 U.S. at 56).  In particular, when the defendant physician contracts with the state to furnish medical services to inmates confined in state prisons, such physician acts "under color of state law for purposes of [section] 1983" when he treats the inmate plaintiff because under such circumstances, the state "bore an affirmative obligation to provide adequate medical care to [the inmate]; the state delegated that function to [the defendant physician]; and [the defendant physician] voluntarily assumed that obligation by contract." *West*, 487 U.S. at 56-57.

In the instant case, despite asserting Dr. Prince does not qualify as a state actor for purposes of liability under § 1983, Defendants do not discuss the terms of the contract by which Dr. Prince agreed to provide medical care to inmates within the custody of DOCCS.  Accordingly, a construction of the record in Plaintiff's favor, *see McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting Fed.R.Civ.P. 56(c) for the requirement that all evidence and reasonable inferences must be construed in the non-movant's favor on summary judgment), requires that summary judgment should be DENIED on this ground.

Defendants also argue that Dr. Prince, who is not a DOCCS employee, did not have the authority to authorize medical treatment for Plaintiff; rather, the primary care provider at each DOCCS facility is responsible for making referral to specialists, such as Dr. Prince, and in this case, the primary care provider was Jacquelyn Levitte, M.D. ("Dr. Levitte").[9]  Defendants' Memorandum at 16.  In support of this argument, Defendants reference the deposition testimony of Dr. Koenigsmann who explains that the correctional facility's primary care provider, who is a DOCCS's employee, was responsible for making referrals to specialty care providers.  *Id.* (citing Dr. Koenigsmann Dep. Tr.[10] at 15-19).  Plaintiff's Response is silent on this issue, and Defendants maintain such silence establishes there is no issue of fact that Dr. Prince was not authorized to increase the amount of care she provided for Plaintiff's ear condition, such that Dr. Prince cannot be found to have been medically indifferent to Plaintiff as a state actor.  Defendants' Reply at 4.  Even assuming, *arguendo*, Defendants are correct that Dr. Prince was unauthorized to determine what medical care was required to adequately treat Plaintiff's ear condition, that fact alone does not address whether the medical treatment Dr. Prince recommended and provided was adequate or suggested deliberate indifference to Plaintiff's serious medical need.  Accordingly, Defendants' Motion also should be DENIED on this ground.

The court thus turns to the merits of Plaintiff's claims.

---

[9] Although Plaintiff names Dr. Levitte as a Defendant, the docket fails to indicate she was served.  *See* Dkt. 22, filed March 1, 2016 (indicating summons returned unexecuted as to Dr. Levitte).  Further, although Dr. Levitte's name is included as a Defendant in the caption of the Amended Complaint, she is not separately listed within the "Parties" section of the Amended Complaint, Amended Complaint at 4, nor are any of the claims specifically asserted against Dr. Levitte.

[10] References to "Dr. Koenigsmann Dep. Tr" are to the transcript of the deposition of Dr. Koenigsmann, filed as Defendants' Exh. C (Dkt. 44-5).

B.    **Eighth Amendment Deliberate Indifference**

"While the Eighth Amendment's prohibition against cruel and unusual punishment 'does not mandate comfortable prisons,' the conditions must be at least 'humane.'" *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  In particular, "[u]nder the Eighth Amendment, States must not deprive prisoners of their 'basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety.'" *Phelps v. Kapnolas*, 302 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).  In the instant case, Plaintiff essentially claims that despite initially characterizing Plaintiff's cholesteatoma as "potentially life threatening" and requiring "urgent" follow-up, Dr. Prince first performed  a surgical exploration of the mastoid cavity on September 28, 2009, and then unnecessarily delayed until November 1, 2010 in performing the skin graft surgery that addressed Plaintiff's debilitating symptoms, and that during the thirteen months between the two surgeries, Plaintiff continued to experience fluid build-up, drainage, vertigo, and severe pain.  Defendants argue Plaintiff's medical record establishes Dr. Prince provided Plaintiff with appropriate medical care such that Plaintiff cannot establish either the objective or subjective prong for an Eighth Amendment deliberate indifference claim.  Defendants' Memorandum at 16.  In opposition, Plaintiff argues genuine issues of material fact exist as to the adequacy of Dr. Prince's treatment of Plaintiff's left ear condition.  Plaintiff's Response at 7-13.  In further support of summary judgment, Defendants maintain Plaintiff has failed to provide any medical evidence rebutting Defendants' evidence demonstrating Dr. Prince's treatment of Plaintiff's ear condition

was below the prevailing standard of care, let alone was deliberately indifferent to a serious medical need.  Defendants' Reply at 2-4.

A viable Eighth Amendment challenge to a conditions of confinement claim requires a plaintiff establish both an objective element and a subjective element. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).  The objective element is met if the plaintiff alleges conditions that objectively pose an unreasonable risk of serious damage to his health so as to deny him "the minimal civilized measure of life's necessities."  *Id.* (internal quotation marks omitted).  When considering these conditions, a court should "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling*, 509 U.S. at 35 (italics in original).  The subjective element requires a plaintiff to allege that the defendant acted with deliberate indifference with regard to the risks posed by the condition.  *Walker*, 717 F.3d at 125.  To establish such indifference, the defendant must have known of the condition that poses an excessive risk to inmate health and chosen to disregard it.  *Id.*  Conduct that constitutes deliberate indifference must be more than mere negligence.  *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

To substantiate an Eighth Amendment claim for medical indifference, an inmate plaintiff must prove the defendants were deliberately indifferent to a serious medical need.  *Farmer*, 511 U.S. at 834-35.  "[P]rison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons."  *Sonds v. St. Barnabas Hospital Correctional Health Services*, 151 F.Supp.2d 303, 311 (S.D.N.Y.

2001) (citing cases). "[A] prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment," *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011), and a difference of opinion between an inmate and prison officials as to prescribed medical treatment does not, as a matter of law, rise to the level of a constitutional violation. *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). Even medical malpractice is insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, an act or omission evincing conscious disregard of a substantial risk of serious harm. *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Where, as here, the challenge is to the adequacy of the treatment provided, such as in cases where treatment is alleged to have been delayed, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, not considered in the abstract." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2013).

A person acts with deliberate indifference to an inmate's health or safety only if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836. It is the equivalent of recklessly disregarding a substantial risk of serious harm to the inmate. *Id.* Supreme Court "'cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment.'" *Id.* at 838 (quoting *Wilson v.*

*Seiter*, 501 U.S. 294, 299 (1991)). "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [Supreme Court] cases be condemned as the infliction of punishment." *Id.* (bracketed material added). "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or *so obvious that it should be known.*" *Id.* at 836 (italics added) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 34, pp. 213-14 (5th ed. 1984); Restatement (Second) of Torts § 500 (1965)). In the instant case, a plain review of Plaintiff's medical records fails to establish either the objective or subjective prong to Plaintiff's Eighth Amendment deliberate indifference claim.

With regard to the objective element, assuming, for the sake of this discussion, that Plaintiff's cholesteatoma posed a sufficiently serious risk to Plaintiff's health, especially his hearing, the record does not establish that Dr. Prince failed to adequately treat the condition. In particular, the record establishes that Dr. Prince provided Plaintiff with treatment 26 times over three years beginning August 18, 2009, when Dr. Prince attempted to clean drainage from Plaintiff's ear, causing Plaintiff to develop nystagmus and to become diaphoretic and nausea, and Dr. Prince then ordered a CT scan of Plaintiff's left mastoid and middle ear, indicating the request was "Urgent" as Plaintiff's condition potentially was "life-threatening," Bates at 1195 (Dkt. 48-3 at 15), because of the proximity of the brain to the ear. Dr. Prince Dep. Tr.[11] at 42. On August 25, 2009, Dr. Prince reviewed the CT scan, noting Plaintiff had PE tubes in both ears and

---

[11] References to "Dr. Prince Dep. Tr." are to the pages of the transcript of Dr. Prince's deposition, filed at Defendant's Exh. B (Dkt. 44-4).

conductive hearing loss attributed to the earlier surgical removal of Plaintiff's ossicles prior to Plaintiff's incarceration at Wende, and planned a surgical exploration of Plaintiff's left mastoid cavity as a diagnostic procedure to determine whether a lateral canal fistula was present which would indicate Plaintiff's recurrent cholesteatoma had advanced.  Bates at 1198; Dr. Prince Dep. Tr. at 46-48.  Dr. Prince maintains this is a standard practice for addressing Plaintiff's symptoms.  Dr. Prince Dep. Tr. at 48.  Dr. Prince performed such diagnostic procedure September 28, 2009, finding Plaintiff's mastoid cavity with a keratin exudate consistent with recurrent cholesteatoma, *id.* at 53-54, and opened up the area to promote outward drainage.  *Id.*  When Plaintiff's ear was still draining at his October 6, 2009 post-operative appointment, Dr. Prince provided Plaintiff with ear drops and silver nitrate to help heal the surgical wound and checked whether the surgical gauze packing could be removed.  *Id.* at 53-57.  Although as of November 17, 2009, Plaintiff's ear was still draining, Dr. Prince declined further surgery at that time, instead recommending fitting Plaintiff with a cross-hearing aid, noting that if Plaintiff's hearing was not then improved, further surgery would be considered, and silver nitrate was discontinued because of the proximity to the facial canal.  Bates at 1213; Dr. Prince Dep. Tr. at 60-63.  Dr. Prince explains she delayed further surgery at that time because each further surgical procedure performed on the ear resulted in additional scar tissue which could exacerbate the collection of fluid as well as the symptoms of which Plaintiff complained.  Dr. Prince Dep. T. at 62-70.  During another exploratory surgery on August 2, 2010, the cholesteatoma had recurred which Dr. Prince removed, placing a drain and provided Plaintiff was antibiotics, followed on November 1, 2010 by a surgical revision and skin graft to help reduce drainage and get

the ear to dry. *Id.* at 71-82.  Following the last procedure, Dr. Prince saw Plaintiff eleven

more times with Plaintiff's ear finally ceasing to drain in November 2011, after which Dr.

Prince no longer treated Plaintiff.  *Id.* at 83-85.  Significantly, Plaintiff references no

medical evidence refuting Dr. Prince's explanation of the treatment she provided for

Plaintiff's left ear cholesteatoma.  Nor did Plaintiff experience any serious harm

attributable to Dr. Prince's care.  *See Salahuddin*, 467 F.3d at 280 (the second inquiry

regarding the deliberate indifference objective inquiring is "whether the inadequacy in

medical care is sufficiently serious").  Accordingly, Plaintiff has not established that Dr.

Prince engaged in conduct that posed a serious risk of damage to Plaintiff's health as

the objective prong of an Eighth Amendment deliberate indifference case requires.

*Walker*, 717 F.3d at 125.

Nor can Plaintiff establish the subjective element requiring that Dr. Prince

knowingly choose to disregard an excessive risk to Plaintiff's health.  *Walker*, 717 F.2d

at 125.  An inmate's disagreement with a course of treatment, including the timing of

specific treatment, does not arise to a constitutional violation so long as the treatment

provided is adequate.  *Chance*, 143 F.3d at 703.  Significantly, Dr. Prince explains, and

Plaintiff does not dispute, that although performing the skin graft procedure sooner may

have resolved Plaintiff's cholesteatoma issue earlier, because the procedure requires

some destruction of the ear's canal wall structure, the standard practice for an

otolaryngologist is to attempt to promote drainage through other methods and

procedures and only if satisfactory results are not then achieved should the skin graft

procedure be used.  Dr. Prince Dep. Tr. at 82-89.  Plaintiff's evidence does not

contradict Dr. Prince's opinion testimony on this material issue; rather, at best, Plaintiff

can establish mere negligence which in insufficient to establish deliberate indifference. *Salahuddin*, 467 F.3d at 280.  Accordingly, on this record, Plaintiff cannot establish the subjective prong of his Eighth Amendment deliberate indifference claim.

Summary judgment should be GRANTED in favor of Defendants on Plaintiff's Eighth Amendment claim.

### C.    First Amendment Retaliation

Plaintiff alleges that Defendant Sticht imposed additional limitations on Plaintiff in connection with the FIC Request, essentially changing the FIC to a medical keeplock despite there being no disciplinary reason for the change which was intended to retaliate against Plaintiff for filing inmate grievances regarding the delayed and assertedly deficient medical treatment for his left ear cholesteatoma.    Amended Complaint ¶¶ 57-59.  In support of summary judgment, Defendants argue that because Defendant Sticht was not aware of Plaintiff's previously filed grievances, Sticht cannot be held liable for retaliation.  Defendants' Memorandum at 16-18.  In opposing summary judgment, Plaintiff maintains that because he filed more than 15 grievances over two years, Defendant Sticht must have been aware of the grievances, Plaintiff's Response at 14-15, such that Sticht's placement of Plaintiff on medical keeplock rather than simply approving the feed-in-cell request without the additional restrictions was intended to retaliate against Plaintiff for filing inmate grievances.  *Id.* at 15-19.  In further support of summary judgment, Defendants maintain Plaintiff's sole assertion in support of his retaliation claim against Defendant Sticht is "strained" and fails to address Defendants' argument that Sticht would have taken the same assertedly adverse action even if

Plaintiff had not filed any grievances. Defendants' Reply at 5-6. There is no merit to Plaintiff's claim.

It is well established that prison officials cannot retaliate against inmates "for the exercise of a constitutionally protected right, such as the filing of a grievance . . . ." *See Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002). It is further well established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under [42 U.S.C.] § 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). To succeed on a First Amendment retaliation claim, the plaintiff must prove "'(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

As to the first requirement, it is well settled that an inmate's pursuit of an inmate grievance constitutes protected activity. *Gayle*, 313 F.3d at 682. For purposes of the second requirement, adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchack*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). As to the third requirement, the plaintiff must show that "the protected conduct was a substantial or motivating factor" for the defendant's action. *Graham*, 89 F.3d at 79. To determine whether a causal connection exists between the inmate's protected activity and the defendant's action, courts examine a number of factors,

including "[1] the temporal proximity between the protected activity and the alleged retaliatory act; [2] the inmate's prior good disciplinary record; [3] vindication at a hearing on the matter; and [4] statements by the defendant concerning his or her motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d 865, 873 (2d Cir. 1995). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* But even if the plaintiff makes this showing, the defendant may avoid liability if he demonstrates that the same action would have been taken against the plaintiff absent the retaliatory motivation. *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may [avoid liability] if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred."). The Second Circuit cautions district courts to view prisoners' retaliation claims with "skepticism and particular care" because of the ease and frequency with which they are fabricated. *Colon*, 58 F.3d at 872. Such skepticism is warranted "because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

Here, even assuming, *arguendo*, that Plaintiff can establish a *prima facie* case of retaliation, Defendant Sticht provides a plausible rationale for imposing the additional limitations on Plaintiff's FIC Request, which Plaintiff does not dispute, such that Defendant Sticht has sufficiently rebutted Plaintiff's *prima facie* case of retaliation.

*Scott*, 344 F.3d at 287-88. In particular, Defendant Sticht explains that in addition to taking his meals in his cell, because the FIC Request was based on Plaintiff's complaints of vertigo, the FIC Permit that was issued prohibited Plaintiff from attending any program or work to protect Plaintiff from injuring himself. Sticht Dep. Tr. at 34-38. According to Sticht, Plaintiff's disciplinary history, including incidents of violence, was a factor Sticht considered in imposing the additional restrictions. *Id.* When asked why Sticht imposed the additional restrictions, Sticht explained that because the FIC Request was based on Plaintiff's vertigo, Sticht realized Plaintiff "wouldn't have balance. It's an inner ear thing usually and I just decided for his safety and for the safety of the facility - - if he can't go to mess hall, he certainly shouldn't be going to work because he could chop his hand off in the metal shop or the maintenance department or wherever he was working. In school, he could get in trouble with the other inmates if he started getting dizzy." *Id.* at 36. According to Sticht, a review of Plaintiff's disciplinary record showed most of Plaintiff's issues involving violence occurred in the correctional facility's messhall, such that if Plaintiff's vertigo interfered with Plaintiff's ability to defend himself, allowing Plaintiff to attend work and programs could expose Plaintiff's to physical force against which he would be unable to defend himself such that failing to impose the contested restrictions could be considered a failure to protect. *Id.* at 37. It is significant that Plaintiff does not challenge any of Defendant Sticht's assertions on this point which establish that Sticht would have imposed the additional restrictions of which Plaintiff complains regardless of whether Plaintiff had filed any inmate grievances. In short, there is no material issue of fact on this issue.

On this record, Defendants' Motion seeking summary judgment should be GRANTED with regard to Plaintiff's First Amendment retaliation claim.

## **CONCLUSION**

Based on the foregoing, Defendants' Motion (Dkt. 44) should be DENIED in part and GRANTED in part; the Clerk of Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:    September 4, 2019
               Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      September 4, 2019
                Buffalo, New York